**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | |
| v. | Case No. 19-20014-CM |
| **CHRIS LEWIS II,** | |
| Defendant. | |

**MEMORANDUM AND ORDER**

On January 31, 2019, defendant Chris Lewis II was charged in a complaint with firearm and drug-trafficking offenses. On June 13, 2019, defendant filed a Motion to Suppress (Doc. 17) seeking suppression of evidence found during an unlawful search of the pickup truck he was riding in, and evidence obtained during the execution of four separate search warrants that were issued based, in part, on the evidence recovered during the unlawful entry of the truck. The court held a hearing on the motion on July 10, 2019. After considering the briefing and the evidence and arguments presented at the hearing, the court is now ready to rule on the motion.

**I.   Background**

On December 19 and 29, 2018, and January 4, 2019, officers with the Kansas City, Kansas Police Department made controlled purchases of crack cocaine from defendant using a cooperating individual. During each of the distributions, defendant drove a red Pontiac G6.

On January 27, 2019 at approximately 6:00 pm, a 911 call came into the Kansas City Kansas, Police Department regarding shots fired at an apartment complex on Wood Avenue. When police arrived at the scene, it was apparent that an armed disturbance had occurred. Shortly after 6:30 pm on January

27, 2019, Kansas City, Kansas police officers were dispatched to the University of Kansas Medical Center ("KU Med") based on reports that a patient had arrived suffering from gunshot wounds.

Evidence and testimony establish that defendant arrived at KU Med as a passenger in a Ford F-250 truck. His girlfriend, Kirsten Cain, drove the truck to KU Med and exited the vehicle with a child—presumed to be her child with defendant. She then opened the passenger door to assist defendant in exiting the vehicle. Defendant had sustained gunshot wounds to his leg. Cain acquired a wheelchair from inside the emergency department, and wheeled defendant into the hospital while carrying the child.

Corporal Blake Eklund with the KU Med police department was working in the emergency department when defendant arrived. He was alerted by a security officer that a vehicle had arrived on the emergency drive carrying a gunshot wound victim. Ecklund located the truck, which was left unattended. He immediately noticed damage to the driver's side of the truck, including a flat tire and bullet-hole damage. He encountered Cain, who told him that defendant had been involved in a shooting in Kansas City, Kansas and that she had driven him to the emergency department. Ecklund then alerted the appropriate investigating agency, the Kansas City, Kansas Police Department, of the potential crime.

Per KU Med protocol, if a gunshot wound victim arrives in a vehicle, KU Med police must standby with the vehicle until the investigating agency arrives to investigate the crime. This is done to ensure no one tampers with the vehicle or any potential evidence. After Ecklund determined the truck was potentially involved in a crime, he called for the KU Med mobile unit to standby with the truck. Officer Latoya Atkins arrived at the scene. Because Ecklund had to do paperwork regarding the incident, he asked Atkins to watch the vehicle until the Kansas City, Kansas police arrived.

After retrieving crime scene tape from her patrol car, Atkins walked around the vehicle to assess any damage so that she could provide information to the investigating agency. She initially observed bullet holes on the driver's side of the vehicle and noticed the driver's side tire was flat. She noted that

-2-

all of the windows were rolled up except for the passenger side window, and there was a strong odor of marijuana coming from the vehicle. Atkins then opened the driver's side door to see if any keys were in the ignition. She testified that often when crime victims arrive at the hospital, they will leave their keys in the ignition in their rush to get inside the emergency department. Atkins checked to see if there were still keys in the truck because she wanted to secure them so that no one would be able to move the vehicle. After opening the door and leaning over the driver's seat for approximately 10 seconds, Atkins determined there were no keys in the vehicle. She testified that she was not looking for anything else in the vehicle other than the keys.

Atkins was unable to block off the immediate area around the truck with crime tape, so she stood by the truck to keep it secure. At some point, Cain returned to the truck and told Atkins she wanted to move the truck. Atkins advised Cain that she would not be able to move the truck because it had been involved in a crime. Cain pulled out the keys to the truck from her purse and handed them to Atkins and then asked if she could retrieve her phone from the truck. Atkins escorted Cain to the driver's side and Atkins opened the door and located a black cell phone in the driver's seat. The phone, however, did not belong to Cain. Atkins and Cain began looking together in the truck to locate Cain's phone when Atkins noticed a gun laying on the passenger floor board. Atkins then alerted other officers that there was a gun in the vehicle.

Officer Wesley Winters arrived to remove the gun and secure it. Upon arrival he noticed a strong scent of burnt marijuana coming from the truck. After the gun was secured, Atkins helped Cain to search the truck for the missing phone. When they were unable to locate Cain's phone, Cain asked for the original phone found on the driver's side. Atkins retrieved the phone and gave it to Cain, who then left to make a phone call. At some point, the Kansas City, Kansas police arrived, and Atkins relinquished the keys to the truck. The truck was later seized and moved to All City Tow.

The truck, a 1992 Ford 250 with an extended cab, was owned by Cain's stepfather. Cain had been driving the truck on a daily basis for a few months before the January 27, 2019 incident. She had given defendant permission to drive the truck approximately 3-5 times in the week leading up to the incident, and at least one of these times defendant drove the truck alone. Cain's stepfather retrieved the truck after it was released from All City Tow.

On January 28, 2019, the Kansas City, Kansas Police Department sought and received search warrants for blood and DNA samples from defendant. Police sought the evidence to prove possession of the gun and use of illegal narcotics. The accompanying affidavits referred to both defendant's crack cocaine distribution and to the January 27, 2019 incident. Police also sought and received a search warrant for the Ford F-250. The accompanying affidavits also referred to both defendant's crack cocaine distribution and to the January 27, 2019 incident. From the truck, police seized marijuana, plastic baggies, a black digital scale, and two cellphones. Police then sought and received a search warrant for the two cellphones.

On January 31, 2019, defendant was charged by criminal complaint. He was later indicted on three counts of distribution of cocaine base, one count of possession with intent to distribute marijuana, one count of possession of a firearm in furtherance of a drug trafficking crime, and one count of fugitive in possession of a firearm.

**II.     Analysis**

Defendant moves to suppress the fruit of the illegal entry of the truck that he rode in when he was taken to KU Med for treatment of a gunshot wound. Defendant argues that Officer Atkins unlawfully opened the door to the truck, which in turn resulted in the seizure of a firearm and the detection of the odor of marijuana. The firearm and marijuana odor then led police to seek four separate

search warrants, which resulted in police seizing evidence of marijuana distribution. Defendant claims that this evidence is fruit of the poisoned tree.

In response, the government argues that defendant lacks standing to challenge the legality of any search of the truck because he has not established a possessory interest in the truck.

*a. Standing*

The government maintains that this court does not have to address the merits of defendant's motion because defendant lacks standing to challenge the alleged illegal search of the truck. The government notes that Cain's stepfather was the owner of the truck, and that Cain was the driver of the truck immediately before the alleged illegal search. Because defendant was only a passenger and has not established a possessory or ownership interest in the truck, he does not have standing to challenge the search.

Fourth amendment rights are personal. *United States v. DeLuca*, 269 F.3d 1128, 1131 (10th Cir. 2001). A party seeking to suppress evidence allegedly acquired in violation of the Fourth Amendment bears the burden of "adducing facts at the suppression hearing indicating that [her] own [Fourth Amendment] rights were violated by the challenged search. *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995). Generally, a defendant cannot claim a violation of his Fourth Amendment rights "based only on the introduction of evidence procured through an illegal search of a third person's property or premises." *United States v. Mosley*, 743 F.3d 1317, 1323 (10th Cir. 2014). Instead, to establish one's standing to challenge an alleged illegal search, the party must show that he had a "'legitimate expectation of privacy in the premises' searched." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018).

The Supreme Court has long held that there is a diminished expectation of privacy in automobiles, "which often permits officers to dispense with obtaining a warrant before conducting a

-5-

lawful search." *Id.* But if a party seeks to challenge the legality of an automobile search, he must establish he has a possessory or property interest in the vehicle searched. *See Mosley*, 743 F.3d at 1322 (noting, "without a possessory or property interest in the vehicle searched, 'passengers lack standing to challenge vehicle searches.'").

It is clearly established that "one who owns and possesses a car, like one who owns and possesses a house, almost always has a reasonable expectation of privacy in it." *Byrd*, 138 S. Ct. at 1527. While it is more difficult to define the "legitimate expectations of privacy of others," the Supreme Court has held that "a person need not always have a recognized common-law property interest in the place to be searched to claim a reasonable expectation of privacy in it." *Id.* But "legitimate presence on the premises of the place searched," by itself, is not enough to establish one's reasonable expectation of privacy. *Id.*

The question here becomes whether defendant had a legitimate expectation of privacy as a passenger in the truck which was owned by his girlfriend's stepfather and driven by his girlfriend.

The Supreme Court has clarified that there is no bright-line rule that passengers *never* have an expectation of privacy in automobiles. *See id.* at 1528 (emphasis added). Instead the Court, in quoting Justice Powell's concurring opinion in *Rakas v. Illinois*, 439 U.S. 128, 154 (1978), noted that a "distinction . . . may be made in some circumstances between the Fourth Amendment rights of passengers and the rights of an individual who has exclusive control of an automobile or of its locked compartments." *Byrd*, 138 S. Ct. at 1528. When an individual has "complete dominion and control" over property, and because of that control he has the right to exclude others, that party likely possesses an expectation of privacy over that property, even if he is not the rightful owner of the property. *Id.* (comparing property interests in privately owned vehicles and rented vehicles and noting, "[b]oth would have the expectation of privacy that comes with the right to exclude."). Therefore, a passenger may

establish standing by "demonstrating some relationship to the vehicle sufficient to establish her lawful possession or control thereof." *Eylicio-Montoya*, 70 F.3d at 1161.

Here, defendant argues he has standing to challenge the alleged illegal search because he had a possessory interest in the truck. He claims that even though he had been riding as a passenger at the time of the incident, Cain had given him permission to drive the truck, and he had, in fact, driven the truck in the days leading up to the incident. According to Cain's testimony, on the evening at issue defendant had been driving the truck up until Cain had to drive him to the hospital after the shooting. He claims this permission and evidence of his control over the vehicle gave him a possessory interest which included a right to exclude.

The Tenth Circuit, however, has held that "prior control of a vehicle is insufficient to establish a passenger's standing to directly challenge a search." *Id.* at 1162. In *Eylicio-Montoya*, the Tenth Circuit found the defendant, who was a passenger at the time of the alleged illegal search, lacked standing to challenge the search. At the suppression hearing, the defendant's son testified that he had borrowed the vehicle at issue from his father and had loaned it to the defendant to get it serviced. *Id.* at 1161. The Tenth Circuit found that the defendant did not have a legitimate expectation of privacy in the vehicle simply because she had been allowed to drive the car prior to the stop.

In considering this set of facts, another court in the District of Kansas held that prior control of a vehicle was sufficient to establish a passenger's standing to challenge a search. In *United States v. Reynolds*, United States District Judge Eric Melgren found that a defendant, who had been given permission to drive the vehicle at issue and who had been observed by officers driving the vehicle almost immediately before the stop, had a "sufficient possessory interest in the vehicle such that he has a protectable Fourth Amendment privacy right in it." No. 15-10093-EFM, 2016 WL 5916949, at *3 (D. Kan. Oct. 11, 2016). Even though the defendant was a passenger at the precise time of the stop, the

evidence showed that the driver had only been driving the vehicle for approximately 30 seconds before stop.[1]

The facts of the present case fall somewhere between these two cases. The truck at issue belonged to defendant's girlfriend's step-father. Defendant's girlfriend had been driving the truck almost exclusively for several months. She had given defendant permission to drive the truck on occasion, and there is evidence that defendant drove the truck on the evening at issue. It was only when he was shot in the leg, according to Cain, that she took over driving the truck. Police never observed defendant driving the truck.

Although it is a close call, the court finds the facts of this case are more similar to with *Eylicio-Montoya* than with *Reynolds*. Based on the evidence, Cain had control and a possessory interest in the truck. She had been driving it daily for several months, on loan from her step-father. And she had been the driver when the truck arrived at KU Med on the night of the incident. While she had given defendant permission to use the truck, defendant had only driven it a "few times" during the time she had exclusive control over the truck, and only once alone without her in the vehicle. According to Cain, defendant had been driving the vehicle earlier in the evening, but this prior control was too attenuated to establish that at the time of the search defendant had a sufficient possessory interest in the truck that would give rise to a legitimate expectation of privacy.

For these reasons, the court finds that defendant does not have standing to challenge the legality of the search of the truck.

*b. Truck Search*

---

[1] The Tenth Circuit affirmed the district court, finding there was no Fourth Amendment violation surrounding the search of the vehicle. *See United States v. Reynolds*, 729 F. App'x 639 (10th Cir. 2018). The court did not discuss or analyze the standing issue.

-8-

Even if defendant had standing to challenge the search, the initial entry by Officer Atkins did not violate the Fourth Amendment and, therefore, the evidence obtained from the search of the truck and the subsequent warrants are not fruits of the poisonous tree.

To again clarify defendant's arguments, defendant claims that the illegal search occurred when Officer Atkins first opened the truck door (which she claims was done to secure the car and to locate the keys). Defendant argues that when Officer Atkins opened the door, without probable cause, she detected the odor of marijuana. Officer Atkins then used the odor of marijuana to justify continuing to search the truck, which in turn resulted in recovering a gun and evidence of marijuana distribution. Defendant claims that had Officer Atkins not opened the door, she never would have detected the odor of marijuana, and there would have been no justification to search the truck.

Based on the evidence, however, it is irrelevant whether Officer Atkins smelled marijuana. Corporal Ecklund testified that he observed the flat tire and bullet hole damage on the truck and that Cain informed him that they had been involved in a shooting and defendant had been shot. Based on his experience, Ecklund knew to notify the Kansas City, Kansas Police Department so that they could investigate whether the truck had been involved in a crime. Part of Ecklund's duties were then to ensure the truck was not tampered with before the police arrived to investigate and collect potential evidence. Officer Atkins was tasked with securing the truck until the Kansas City, Kansas police arrived at the scene. In surveillance video, defendant, Cain, and their small child are seen leaving the truck unattended with the tail lights on. Atkins testified that when she arrived to secure the truck, she opened the driver's side door of the truck to make sure there were no keys in the ignition. The Supreme Court has held that warrantless searches and seizures, based on probable cause, are justified in vehicles because a "vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Collins v. Virginia*, 138 S. Ct. 1662, 1669 (2018) (citing *Carroll v. United States*, 267 U.S. 132 (1925)).

First, it was reasonable for Atkins to open the truck door to check for keys as part of her duties in securing the truck. The lights were still on, which would raise a reasonable belief that keys may still be in the ignition. If the keys were still in the ignition, Cain, defendant, or any other individual could easily have moved the truck at any time before the police arrived and could have tampered with potential evidence.

Second, there was arguably probable cause that the truck contained evidence of a crime that would justify a search of the truck. Corporal Ecklund recognized that the damage to the truck, Cain's assertion that she and defendant had been involved in a shooting, and defendant's gun shot wound, were signs that the truck may contain evidence of a crime. Because of this, he notified the Kansas City, Kansas Police Department and had Atkins secure the truck to ensure potential evidence was not tampered with. This alone is justification for Atkins to search the truck, or at the very least, temporarily seize the truck. *See Florida v. Harris*, 568 U.S. 237, 243 (2013) (noting, "[a] police officer has probable cause to conduct a search when 'the facts available to [him] would 'warrant a [person] of reasonable caution in the belief' that contraband or evidence of a crime is present.").

Further, no evidence was discovered during Atkins's initial entry into the truck. It was not until Cain came back to the truck and asked if she could retrieve her phone that Atkins found the gun. According to Atkins, Cain came back out of the emergency department and asked if she could move the truck. Atkins advised her that she would not be able to move the truck, and then Cain handed Atkins the keys. At this point, Cain asked if she could retrieve her phone. Together, she and Atkins went to the driver's side of the truck and Atkins opened the door and found a black phone. When Cain responded that that was not her phone, she and Atkins together began looking in the truck, trying to locate Cain's phone. It was then that Atkins noticed, in plain view, a gun laying on the passenger floor board. Atkins then alerted other officers that there was a gun in the vehicle, and Officer Winters arrived to remove and

secure the gun.  Arguably, Atkins had consent from Cain to enter the vehicle to search for the phone.  It was during this search that she noticed, in plain view, the gun.  And when Officer Winters came to secure and remove the gun, he noticed the smell of marijuana, thus justifying a further search of the truck and the issuance of later search warrants.  Therefore, none of the evidence at issue was illegally obtained, and additional evidence recovered as a result of the subsequent search warrants was not fruit of the poisonous tree.[2]

**IT IS THEREFORE ORDERED** that defendant's Motion to Suppress (Doc. 17) is denied.

Dated July 29, 2019, at Kansas City, Kansas.

                                                             s/ Carlos Murguia
                                                           **CARLOS MURGUIA**
                                                           **United States District Judge**

---

[2] The government concedes that the affidavit that was used to search the cellular telephones recovered during the search of the truck included facts from an unrelated investigation, and therefore lacked probable cause.  The government maintains it will not seek to present any evidence obtained from those warrants in its case-in-chief.